John C. McNett (*pro hac vice*)
William A. McKenna (*pro hac vice*)
Blake R. Hartz (*proc hac vice*)
Woodard, Emhardt, Moriarty, McNett & Henry LLP
111 Monument Circle, Suite 3700
Indianapolis, Indiana 46204
Telephone: (317) 634-3456
E-Mail: jmcnett@uspatent.com
E-Mail: wmckenna@uspatent.com
E-Mail: bhartz@uspatent.com

Jennifer J. Moon (SBN 186201)
Wilson Elser Moskowitz Edelman & Dicker LLP
555 Flower Street - Suite 2900
Los Angeles, CA 90071-2407
Tel: (213) 443-5100
E-mail: Jennifer.moon@wilsonelser.com

*Attorneys for Defendants*
*Blonder Tongue Laboratories, Inc. and*
*R.L. Drake Holdings, LLC*

Frank C. Corso (*pro hac vice*)
CORSO LAW LLC
492 Winthrop Street, Suite 5
Rehoboth, MA 02769
E-mail: fcc@corsolaw.com

Steven R. Parminter (SBN 90115)
Jennifer J. Moon (SBN 186201)
Wilson Elser Moskowitz Edelman & Dicker LLP
555 Flower Street - Suite 2900
Los Angeles, CA 90071-2407
Tel: (213) 443-5100
Fax: (213) 443-5101
E-mail: Steven.Parminter@wilsonelser.com
E-mail: Jennifer.moon@wilsonelser.com

*Attorneys for Defendants RLD69, LLC*
*f/k/a R.L. Drake, LLC*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| K-TECH TELECOMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> BLONDER TONGUE LABORATORIES, INC.; R.L. DRAKE HOLDINGS, LLC; R.L. DRAKE, LLC; AND RLD '69, LLC, <br><br> Defendants. <br> #959429 | CASE NO. CV12-05316 RGK (RZx) <br><br> **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date:    August 26, 2013 <br> Time:    9:00 AM <br> Place:   Court Room 850 <br>            Judge R. Gary Klausner |

Defendants have moved for partial summary judgment, and submit this memorandum in support.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.      LEGAL STANDARDS................................................................1

   A.    Summary Judgment Is Only Proper Absent Genuine Disputes..............1

   B.    Previously Known Inventions Are Unpatentable. ...................1

   C.    Obvious Variations on the Prior Art Are Unpatentable..........................2

   D.    Rule 30(b)(6) Deposition Statements Bind the Organization..................3

II.     K-TECH'S PATENTS CLAIMS ARE ANTICIPATED BY OR ARE OBVIOUS VARIATIONS ON THE IDEAS OF OTHERS, AND ARE INVALID..................................................................4

   A.    Digital Television Signals Include Descriptive Data Like PSIP. ............4

   B.    The Claims Were Previously Invented By, Obvious to, or Published By Others.................................................4

      1. Zenith Invented Earlier, Rendering K-Tech's Claims Invalid.................4

      2. Divicom Invented Earlier, Rendering K-Tech's Claims Invalid. .............7

      3. Thomcast Invented and Published Earlier, Rendering K-Tech's Claims Invalid. ....................................8

   C.    The Claims Are an Obvious Application of New Standards Definitions to Existing Technology. ......................................9

   D.    K-Tech Cannot Think of Any Way Prior Art Devices Function Without Using the Invention...................................10

III.    DEFENDANTS' CABLE DEVICES DO NOT INFRINGE. ....................13

    A.    Infringement Determinations Require Claim Construction...................13

    B.    The Claims Relate to Digital Television Signals for Broadcast. ...........15

        1. "Digital Television [RF] Signal" ('903 Claims 1, 5, 8, 10; '533

            Claims 11-12) ..........................................................................16

        2. "Channel Data," "Attributes for a Virtual Channel," and "Virtual

            Channel Table" ('903 Claims 1, 5, 8, 10; '533 Claim 1-3, 11-12;

            '893 Claims 1, 9, 13-15) ..........................................................18

    C.    Defendants' Products Produce Digital Television Signals for

            Cable..........................................................................................19

IV.    CONCLUSION ............................................................................19

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ...................................................................................1

*Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1037 (Fed. Cir. 2001) .....2

*Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347, 51 U.S.P.Q.2d 1943, 1947 (Fed. Cir. 1999)........................................................................................1

*Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n*, 54 F.3d 756, 762 (Fed. Cir. 1995) ....................................................................................................2

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006) ............................................................................................................17

*Ecclesiastes 9: 10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 (10th Cir. 2007)...............................................................................................3

*Fantasy Sports Props. v. Sportsline.com*, 287 F.3d 1108, 1115-16 (Fed. Cir. 2002) ......................................................................................................17

*Fox Group, Inc. v. Cree, Inc.*, 700 F.3d 1300, 1306 (Fed. Cir. 2012) ...................2

*In re Paulsen*, 30 F.3d 1475, 1479, 31 U.S.P.Q.2d 1671, 1673 (Fed. Cir. 1994)...1

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007)........................................................................................................2

*Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364 (Fed. Cir. 2003)....................14

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364 (Fed. Cir. 2006)................14

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996) ...................................................................................13

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ..............13

*MySpace Inc. v. GraphOn Corp.*, 672 F.3d 1250 (Fed. Cir. 2012)......................14

*Nystrom v. Trex Co., Inc.*, 424 F.3d 1136 (Fed. Cir. 2005)................................17

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1371-1372 (Fed.Cir.2007)..................................................................................................2

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)................................13, 14

*QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012)........3

*Quanta Comp., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 128 U.S. 2109, 170 L. Ed. 2d 996 (2008)..............................................................................................14

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .................14

## Statutes

35 U.S.C. § 102 (2012)...................................................................1, 2, 7, 8

35 U.S.C. § 103 (2012)...............................................................1, 2, 7, 8, 10

## Rules

Fed. R. Civ. P. 30(b)(6) .....................................................................3

Fed. R. Civ. P. 56.............................................................................1

Memorandum in Support of Defendants' Motion for Partial Summary Judgment

## I.    LEGAL STANDARDS

### A.    Summary Judgment Is Only Proper Absent Genuine Disputes.

Summary judgment is proper only where the evidence "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A party opposing a properly supported motion for summary judgment "'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *First National Bank of Arizona v. Cities Svc. Co.*, 391 U.S. 253, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)). "If the evidence [in opposition] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

### B.    Previously Known Inventions Are Unpatentable.

Claims are invalid if they are either anticipated or obvious in view of the prior art. 35 U.S.C. §§ 102, 103 (2012).[1] If all of the elements of a claim are found in a single reference, then the claim is invalid as being "anticipated" by the prior art reference. *In re Paulsen*, 30 F.3d 1475, 1479 (Fed. Cir. 1994). A reference is considered to disclose the subject matter that is either expressly or inherently disclosed in that document. *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999). If an element is not expressly disclosed in a prior art reference, the reference still anticipates a subsequent claim if a person of ordinary skill in the art would recognize that the missing element is necessarily present in

---

[1] Sections 102 and 103 of Title 35 were significantly amended as part of the America Invents Act of 2011 ("AIA"). The pre-AIA versions apply to K-Tech's claims, and all references herein are to the prior versions.

the reference. *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1371-1372 (Fed.Cir.2007).

Furthermore, a claim is invalid if, prior to the alleged invention, "the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g)(2). Commercialization is one "convenient way[]" to prove an invention has been disclosed to the public, rather than abandoned, suppressed, or concealed. *Fox Group, Inc. v. Cree, Inc.*, 700 F.3d 1300, 1306 (Fed. Cir. 2012). "[R]easonable efforts to bring the invention to market" negate any inference that the invention was abandoned, suppressed, or concealed. *Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n*, 54 F.3d 756, 762 (Fed. Cir. 1995). Such reasonable efforts can span several years. *See id.* (four years). At summary judgment, the party asserting a § 102(g) defense need only show prior invention, which shifts the burden of production to the patentee to create an issue about whether the prior inventor suppressed or concealed. *Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1037 (Fed. Cir. 2001).

C.    Obvious Variations on the Prior Art Are Unpatentable.

If a claim is an obvious variation of a prior reference, or an obvious combination of elements found in prior references, it is invalid under § 103. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007). In short, a "combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 416. And while an explicit teaching, suggestion, or motivation is a "helpful insight" in the obviousness analysis, "a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ," *KSR*, 550 U.S. at 418, and should not "deny fact finders recourse to common sense," *id.* at 421.

### D.    Rule 30(b)(6) Deposition Statements Bind the Organization.

Under Federal Rule of Civil Procedure 30(b)(6), corporations have an affirmative duty to provide a witness who can provide complete, knowledgeable, and binding testimony on the corporation's behalf. *Ecclesiastes 9: 10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 (10th Cir. 2007). Thus, an organization that does "not provide a well-prepared witness for its 30(b)(6) witness . . . will be bound by his deposition at trial and will not be allowed to enlarge his testimony at trial regarding information he professed not to know during his deposition." *Newport Elecs., Inc. v. Newport Corp.*, 157 F. Supp. 2d 202, 213 (D. Conn. 2001).

Similarly, "the lack of knowledge answer is itself an answer which will bind the corporation at trial" and "a corporation which provides a 30(b)(6) designee who testifies that the corporation does not know the answers to the questions 'will not be allowed to change its answer by introducing evidence at trial.'" *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012) (citation omitted); *id.* at 700 ("QBE is precluded from taking a position at trial, including the introduction of testimony and exhibits, on those issues for which Mr. O'Brien was unable to provide 30(b)(6) testimony."); *see also id.* at 687-691 (outlining the purposes and doctrine regarding Rule 30(b)(6)).

Steve Kuh was produced as the designated witness for the July 9, 2013 deposition of K-Tech, on all noticed topics. (*See* Doc. 127, Ex. 5, K-Tech Dep. 11: 1-4.) Kuh had not seen the deposition topics prior to the start of the deposition (*id.* at 10:12-24), and did no preparation (*e.g.*, *id.* at 179:4-21). K-Tech cannot now provide contrary positions for topics which it was not knowledgeable about at deposition.

## II.    K-TECH'S PATENTS CLAIMS ARE ANTICIPATED BY OR ARE OBVIOUS VARIATIONS ON THE IDEAS OF OTHERS, AND ARE INVALID.

### A.    Digital Television Signals Include Descriptive Data Like PSIP.

Digital television signals travel through the air or over wired connections as a waveform. The waveform can be converted to a stream of bits through a process called demodulation. (Conversely, bits can be converted to a waveform by modulation.) In most digital television signal formats, these bits are in a compressed format based on MPEG-2. MPEG-2 is a standard transmission format that contains packetized information for audio, video, and data related to the audio and video sent in the transport stream. The process of separating out various packets from a stream is generally called demultiplexing. (Conversely, combining various packets is multiplexing.)

The American Television Systems Committee (ATSC) approved, in December 1997, standard A/65 defining Program and System Information Protocol (PSIP) information for digital television. (*See* Doc. 120-121, Ex. 1, Pierce Decl. ¶ 9 and Ex. G.)  PSIP is "a collection of hierarchically-associated tables each of which describes particular elements of typical digital TV services." (*Id.* Ex. G at 69.) Included in PSIP is a Virtual Channel Table (VCT) which contains a list of all the channels available in the Transport Stream" and attributes such as major and minor channel numbers and carrier frequencies. (*Id.* Ex. G at 75-76; Doc. 1, p. 40 ['903 Patent], col. 1:65–2:18.) New to this standard was the adoption of the use of "major and minor channel numbers."

### B.    The Claims Were Previously Invented By, Obvious to, or Published By Others.

#### 1. Zenith Invented Earlier, Rendering K-Tech's Claims Invalid.

Employees of Zenith Electronics Corp. invented a Zenith Baseband PSIP Fixer Translator at least as early as February 1999. (*See* Doc. 126, Ex. 3, Frahm Decl. ¶ 7, Ex. C). This is before any dated invention evidence of the K-Tech

patents, and includes the limitations of the asserted claims of the K-Tech patents, assuming K-Tech's positions on claim scope. The Zenith system includes an ATSC demodulator that converts a digital television signal into a transport stream, a Baseband PSIP Fixer that modifies a major channel number, minor channel number, or carrier frequency in an incoming PSIP VCT to generate a new PSIP VCT, and an ATSC Modulator that converts the transport stream into an IF (intermediate frequency) signal that is then up-converted to RF (radio frequency). (*See* Doc. 126, Ex. 3, Frahm Decl. ¶ 7 & Ex. C; and Doc. 120, Ex. 1, Pierce Decl. ¶ 25.) This document teaches or renders obvious every element of the asserted claims as construed by K-Tech, and detailed claim charts are provided in Ex. L to the Pierce Declaration (*See* Doc. 122), at pages 38-51 to illustrate this fact. K-Tech testified that it does not know how the Zenith invention differs from its patents:

> Q. Okay. And there are two changes to the terrestrial virtual channel table that you think it probably means. What are those two possible changes or three, depending on how you want to look at it?
>
> A. It's written here that carrier frequency, major and minor channel numbers are possible changes to the PSIP TVCT.
>
> Q. Okay. Isn't that pretty much what's in your patent?
>
> A. I don't know.
>
> Q. You don't know what's in your patent?
>
> A. Please -- please be specific.
>
> Q. Does your patent discuss changing the VCT carrier -- carrier frequency?
>
> A. Can you re -- restate the question?
>
> Q. Does your patent discuss changing the VCT carrier frequency in the PSIP data?
>
> A. Yes.

Q. Does your patent discuss changing major and minor channel

numbers in the VCT in the PSIP?

A. Yes.

Q. Okay. So the question is how is this any different than what is

shown in your patent in that regard?

A. I don't know.

(*See* Doc. 127, Ex. 5, K-Tech Dep., at 175: 25–176:25.)[2] Of the elements not

explicitly found in the PSIP Fixer document, such as an amplifier, those items are

either implicitly present, or are familiar elements that would provide predictable

results and therefore be obvious. *KSR*, 550 U.S. at 416; Doc. 120, Ex. 1, Pierce

Decl. ¶ 25.

The Zenith PSIP Fixer document is dated February 1999, well prior to K-

Tech's filing date or any other date of conception by K-Tech for which there is

documented, corroborated proof. Thus, Zenith's PSIP Fixer is a prior invention.

Zenith began working on a translator project that included a PSIP Fixer by

February of 1999. (Doc. 126, Ex. 3, Frahm Decl. ¶ 7.) Zenith's PSIP Fixer

invention was later embodied in model DTV-TRANS-4 that was sold to LG

Electronics in March 2000 and marketed at the National Association of

Broadcasters Convention in April 2000. (Doc. 126, Ex. 3, Frahm Decl. ¶¶ 4-8 &

Exs. A, B.) K-Tech has admitted that the Zenith's ATSC VSB Translator was

marketed at the convention. (Doc. 103-6, Ex. 4, File History Excerpt, at 1.)

---

[2] K-Tech did not reserve the right to review or correct its deposition during the
deposition, nor did K-Tech request a continuance as to any topic.  See McNett
Declaration Document 119-1, ¶ 10.  All of the prior art that was the subject of
questioning during the deposition had been earlier provided to K-Tech.  See
McNett Declaration Document 119-1, ¶ 7.  Topics No. 28 for K-Tech's
deposition was "Knowledge of the art from 1997 through 1999, including the
1997 ATSC standard, as well as . . . . Zenith Electronics, (in particular model
DTV TRANS-A) . . . . (Doc. 127, Ex. 5, K-Tech Dep. Ex. 1, at 12.)

From April 1999 until the product was shipped in March 2000, Zenith worked continuously to develop, implement, and test a product including the features shown in ZEN000008, including the remapping of virtual channel tables in a television broadcast translator. (Doc. 126, Ex. 3, Frahm Decl. ¶ 7-8.[3]) The thirteen months "from conception to delivery to a customer, for a company the size of Zenith, was a remarkable accomplishment." (Doc. 126, Ex. 3, Frahm Decl. ¶ 8.) Therefore Zenith could not have abandoned, suppressed, or concealed the invention. K-Tech's asserted claims are thus invalid under §§ 102(g) and 103(a).

*2. Divicom Invented Earlier, Rendering K-Tech's Claims Invalid.*

In 1998, DiviCom, Inc. began preparing to implement a Program Information Table Manager (PIT) that could manipulate PSIP. (Doc. 120, Ex. 1, Pierce Decl. ¶ 11.) This device would, when combined with other standard components, receive an incoming stream having a Virtual Channel Table and subsequently generate an outgoing stream having a different Virtual Channel Table from that of the incoming stream. (*Id.*) Divicom promoted and offered such a system for sale to customers in 1998 and 1999 (*id.* at ¶¶ 13-15, 18), and started implementing the system in early 1999 (*id.* at ¶ 17). As shown in the charts attached as Ex. K (pages 2-15 of the charts) to the Pierce Declaration (Doc. 122), this DiviCom system anticipates or renders obvious all of the claims asserted by K-Tech. Therefore, K-Tech's asserted claims are invalid under §§ 102(g) and 103(a).

---

[3] Further evidence of the development effort is in Doc. 123-125, Ex. 2, Kail Decl., Ex. A.

*3. Thomcast Invented and Published Earlier, Rendering K-Tech's Claims
Invalid.*

Still further, an article published at least by April 22, 1999[4] anticipates,
under § 102(a)[5], several of K-Tech's much later claims to *changing digital
television channel assignments for broadcast.* (See Doc. 120, Ex. 1, Pierce Decl.
¶ 24.) In *Implementing PSIP Solutions* by Pierre Clement et al. ("Clement"), a
digital head-end system is described which receives signals from multiple
broadcasters. (Doc. 121, Ex. 1, Pierce Decl. Ex. F, at 5-6.) In order to resolve
possible conflicts in information received from the two broadcasters, "some
proper tables are to be reconstructed from the incoming PSIP tables." (*Id.* at 6,
col. 2.)  Clement also recognizes that "the VCT as well as in the MGT parameters
related to transportation may need to be changed. . . . [T]he frequencies . . . may
also be affected." (*Id.* at 7, col. 2.)

Clement's teachings describe a system that equates to "a digital television
translator that updates the PSIP table with proper channel and carrier frequency
information." ('903, Summary of the Invention, Doc. 1, p. 40, col. 2: 50-55.) As
shown in the charts attached as Ex. K to the Pierce Declaration (Doc. 122),
Clement teaches all of the elements of claims 1, 5, 8 of the '903 patent, claims 1-3
of the '533 patent, and claim 1, 9, 13-15 of the '893 patent (pages 28-37 of the
charts). The other claims are obvious over Clement in combination with well-
known and universally applied technologies such as power amplifiers. (*See id.*)
The claims are invalid under §§ 102(a) and 103(a).

_____

[4] See McNett Declaration, Document 76-3, ¶¶ 7 and 9.  An audio recording of
Clement's presentation of his article at the April 1999 NAB convention was made
available to Plaintiff in discovery.

[5] "A person shall be entitled to a patent unless . . . the invention was . . . described
in a printed publication in this or a foreign country, before the invention thereof
by the applicant . . . ." 35 U.S.C. § 102(a) (2012).

C. The Claims Are an Obvious Application of New Standards Definitions to Existing Technology.

Invalidity is also demonstrated using the Cartwright et al. patent, U.S. Pat. No. 6,438,171 (Doc. 122, Ex. 1, Pierce Decl. Ex. K)[6] in light of the ATSC standards. The ATSC standards are based on European "DVB" standards that include System Information (SI) and Program Specific Information (PSI) tables that relate to channel assignments. (Doc. 120, Ex. 1, Pierce Decl. ¶ 23.). The Cartwright et al. patent suggests providing different SI and PSI at output to avoid conflicts in channel assignments (Doc. 122, Ex. 1, Pierce Decl. Ex. K at col. 1:41-54; col. 2:7-12; col. 2:25-33.)

Cartwright teaches processing of "tables of data each of which carries information about particular parameters, e.g. about the network that the signal is carried on" (Doc. 122, Ex. 1, Pierce Decl. Ex. K at col. 1: 15-22),"the data processor 16 uses information in the tables extracted from the transport stream by the block 15 and information entered by the operator . . . and generates new reprocessed tables which are supplied to the buffer to be multiplexed with the output from the buffer 18." (*Id.* at col. 3: 44-49.) Once the ATSC A/65 standard was adopted in the United States in 1997, including the virtual channel table (VCT) (i.e. "information… about the network that the signal is carried on") the implementation of the Cartwright technology in the United States predictably results in the very inventions that K-Tech's later sought to patent. (Doc. 120, Ex. 1, Pierce Decl. ¶ 23.). Element-by-element comparison to the Cartwright patent is provided in the charts of Ex. L to the Pierce Declaration (Doc. 122) (pages 16-

---

[6] Cartwright was assigned to Tandberg Television, and filed in the U.S. in 1997 and published in 1999. Topics No. 28 for K-Tech's deposition was "Knowledge of the art from 1997 through 1999, including the 1997 ATSC standard, as well as technology from . . . . Tandberg, now Ericsson, . . . ." (Doc. 127, Ex. 5, K-Tech Dep. Ex. 1 at 12.)

9

27 of the charts). K-Tech admits that it does not know how to distinguish the Cartwright reference:

> Q. In this particular patent, it talks about modifying data.
>
> And my question is -- if you look at the abstract, the last sentence, "The constantly updated tables in the input stream are only modified [sic] in respect of the local changes and the updates are passed through to the output stream."
>
> Isn't that the same thing that your PSIP update does in your patent?
>
> A. I don't know.
>
> Q. Can you think of any arguments that might differentiate that from what you do with your PCIP – PSIP update?
>
> A. I don't know.
>
> Q. Okay. Let's look at Column 3, if you can. There is a paragraph that starts "the data processor 16." And I'd ask if you see any difference from that description when compared with what is done in the products that you make under Defendants' Exhibit 2[7]?
>
> A. I don't know.

(Doc. 127, Ex. 5, K-Tech Dep. at 146: 6–147: 1.)[8] The claims are invalid under § 103(a).

### D.    K-Tech Cannot Think of Any Way Prior Art Devices Function Without Using the Invention.

K-Tech's patents claim invention in *changing digital television channel assignments for broadcast*. As shown by Howdy Pierce's declaration, K-Tech's

---

[7] Exhibit 2 in the deposition was a list of K-Tech model numbers, with sales figures by year, that allegedly embody (or "implement") the K-Tech patents. (Doc. 127, Ex. 5, K-Tech Dep. 30: 17-22, 31: 18–32: 1.)

[8] See Footnote 5 above.

patent claims were anticipated by prior art devices, prior art publications, prior art offers for sale, and prior invention, or were obvious from that prior art. (Doc. 120 and 122, Ex. 1, Pierce Decl. ¶¶ 21-25, Ex. L.)  In order to comply with the PSIP standards adopted in 1997, devices offered for sale in 1998 and thereafter that implemented this standard and allowed for multiplexing of multiple input streams "would receive an incoming stream having a Virtual Channel Table and subsequently generate an outgoing stream having a different Virtual Channel Table from that of the incoming stream." (Doc. 120, Ex. 1, Pierce Decl. ¶ 11.) This is the same function that K-Tech much later attempted to patent when it wrote claims on *changing digital television channel assignments for broadcast.*

A Lucent Digital Video product announced in March 1999 that it was demonstrating PSIP software with "the ability to remap channel numbers, which is important for branding as stations make the transition to digital." (Doc. 127, Ex. 5, K-Tech Dep. Ex. 13, at 1.) This device appears to embody the asserted claims. (Doc. 120, Ex. 1, Pierce Decl. ¶ 22.) K-Tech does not know how this differs from the VCT manipulation taught in the patents-in-suit:

> Q. Okay. This talks about their PSIP software that has the ability to remap channel numbers. Wouldn't that necessarily involve the changing of the virtual channel tables in PSIP --
>
> A. I don't know.
>
> Q. -- for this PSIP software?
>
> A. I don't know.
>
> Q. Can you think of any other way that it could accomplish that end?
>
> A. I don't know.

1    (Doc. 127, Ex. 5, K-Tech Dep., at 128: 25–129: 9.)[9]

2    Scientific Atlanta's PowerVu Stream Guide, publically described at least as

3    early as April 5, 1999, is described as delivering "program services information

4    protocol (PSIP) according to ATSC A165 [sic] standard" and supporting

5    "passthrough, modification, and complete replacement of tables allowing local

6    identity by the Broadcaster." (Doc. 121, Ex. 1, Pierce Decl. Ex. H, at 2.)  As with

7    the Lucent system, this product appears to embody the asserted claims. (Doc. 120,

8    Ex. 1, Pierce Decl. ¶ 22.)

9    In *Transmultiplexing, Transcontrol and Transscrambling of MPEG-2/DVB*

10    *Signal* by Bungum ("Bungum"), the author discusses "transmultiplex[ing] signals

11    from several different sources to make up a new transport stream in a cost-

12    effective and DVB compliant way." (Doc. 127, Ex. 5, K-Tech Dep. Ex. 16, at 1.)

13    Bungum describes changes in a Network Information Table (NIT) such as

14    "network name, the delivery system descriptor (with physical parameters for the

15    multiplex as frequency etc.)" that "take place if for example a cable network is

16    moving a multiplex from one channel to another." (*Id.* at 3.) An output signal

17    contains "services from the different input transport streams together with the

18    regenerated PSI and SI tables." (*Id.*) This is, effectively, a channel remapping

19    function, although not formatted as PSIP. K-Tech does not dispute this:

20    Q. Apart from the fact that it is for a DVB system as opposed to an

21    ATSC system, are there any differences between what's described in

22    that paragraph and your PSIP update that's shown in your patents?

23    A. I don't know.

24

25

---

26    [9] Topics No. 28 for K-Tech's deposition was "Knowledge of the art from 1997
through 1999, including the 1997 ATSC standard, as well as technology from . . .
27    . Scientific Atlanta, . . . ." (Doc. 127, Ex. 5, K-Tech Dep. Ex. 1 at 12.)

28

Q. In your patent, you regenerate a PSIP signal table, I should say?

The VCT table?

A. Yes.

Q. Okay. Is that any different than the regeneration of the SI tables

described in this article?

A. I don't know.

(Doc. 127, Ex. 5, K-Tech Dep. at 151: 10-20.)[10]

These and other prior art publications, patents, and products render K-

Tech's patents invalid.

## III.    DEFENDANTS' CABLE DEVICES DO NOT INFRINGE.

Construed properly, the claims asserted in K-Tech's motion are to systems

for changing conflicting digital television channel assignments for broadcast.

Because Defendants' products are related to signal processing equipment for

cable transmission, and not broadcast, the products do not infringe.

### A.    Infringement Determinations Require Claim Construction.

A patent infringement analysis is a two-step process. "The first [step] is

determining the meaning and scope of the patent claims asserted to be infringed .

. . . The second step is comparing the properly construed claims to the device

accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979

(Fed. Cir. 1995) (en banc).

Claim construction is a question of law to be decided by the court.

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 116 S. Ct. 1384, 134

L. Ed. 2d 577 (1996). The Federal Circuit's seminal *en banc* decision in *Phillips

v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) provides the framework for doing

so.  Claims "are generally given their ordinary and customary meaning," which is

"the meaning that the term would have to a person of ordinary skill in the art in

---

[10] The Bungum reference describes a Tandberg product. See footnote 5.

question at the time of the invention." *Id.* at 1312-13. The person of ordinary skill in the art reads the claim term "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1313. Recently, the Court has restated this as "two limiting factors" for claim construction, "what was invented" as determined by the specification, and "what exactly was claimed" as determined by the specific claim language. *MySpace Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1256 (Fed. Cir. 2012).

In interpreting the claims, the Court should primarily look to intrinsic evidence, which includes the claim language, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1312-17. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315. "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321. "[T]he prosecution history can often inform the meaning of the claim language" and includes the prior art cited during the examination of the patent. *See id.* at 1317. Thus, "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003). Similarly, even if a patent does not "expressly adopt" definitions in an industry standard, "that standard remains relevant in determining the meaning of the claim term to one of ordinary skill in the art at the time the patent application was filed, and it is treated as intrinsic evidence for claim construction purposes." *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1375 (Fed. Cir. 2006), *rev'd on other grounds sub nom. Quanta Comp., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 128 U.S. 2109, 170 L. Ed. 2d 996 (2008).

Extrinsic evidence (i.e., everything that isn't intrinsic) can shed light on the relevant art, but where the meaning of the claim is clear based on the intrinsic evidence, it is improper to rely on extrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Id.*

### B.    The Claims Relate to Digital Television Signals for Broadcast.

Defendants submit that several claim terms require construction prior to determination of the infringement issue. First, the claim terms "digital television signal" ('903 claims 1, 5, 8, 10) and "digital television RF signal" ('533 claims 11-12) refer to broadcast digital television signals. Second, the terms "channel data" ('903 claims 1, 5, 8, 10) or "attributes for a virtual channel" ('533 claim 1-3; '893 claims 1, 9, 13-15) or "virtual channel table" ('533 claims 11-12) refer to channel data formatted for broadcast digital television. K-Tech claims to have invented the changing of conflicting digital television channel assignments for broadcast.

Because the specifications for the asserted patents are nearly identical, for convenience reference will be made only to the specification of the '903 patent (U.S. Patent 6,785,903, filed in Court as Document 1, pages 34-45). Moreover, because the '903 patent refers to compliance with the ATSC A/65 standard and the standard is included in the prosecution history, the A/65 standard also constitutes intrinsic evidence.[11]

---

[11] Citations to the A/65 Standard will be to Ex. G to the Pierce Declaration, rather than to the prosecution history, in order to eliminate several hundred additional pages of material not currently at issue.

1. *"Digital Television [RF] Signal" ('903 Claims 1, 5, 8, 10; '533 Claims 11-12)*

The K-Tech patents consistently refer to broadcast or terrestrial digital television signal standards. For example, all translator embodiments include an "8-VSB modulator" labeled 13 (FIG. 2) or 24 (FIG. 4). "8-VSB modulator 13 processes the transport stream having the updated PSIP data according to ATSC terrestrial <u>broadcast</u> standards." (Doc. 1, p 42, col. 5: 3-5 (underlining added).) The second embodiment, Figure 4, describes the transport stream that "is then sent to 8-VSB modulator 24 and converted into a DTV signal consistent with the operation <u>as described in the first embodiment</u>." (Doc. 1, p 42, col. 5: 48-51 (underlining added).)

Similarly, the patents describe the problem of two <u>broadcasters</u> using the same channel numbers in the same geographic regions, which can prevent both broadcasters' signals from being received properly (Doc. 1, p 40, col. 2: 37-47.) A solution supposedly provided by the translator invention is a change to the channel number of one signal when a broadcaster "may be licensed to broadcast in the translator's geographical area, but at a different channel." (Doc. 1, p 41, col. 4: 45-47.)  Moreover, the third embodiment (FIG. 6) is a distribution network of translators 31*a*-31*d* shown as broadcasting antennas (*see* Doc. 1, p 42, col. 6: 20-65). While non-broadcast signals can be on the input side of the translator (Doc. 1, p 41,, col. 4: 9-11), the important fact is that *all* signals on the output side of the translator are in a form for broadcasting.

An examination of the claims confirms that the claims are limited to producing digital television signals at an output that are <u>for broadcast</u>. For example, the '903 claims consistently refer to terrestrial or broadcast standards to produce the "digital television signal" (claims 5, 28, 39), video data "that conforms to the USA terrestrial digital television broadcast standard" (claims 7, 30, 41), or a form of VSB modulation (claims 8-9, 31-32, 42-43). 8VSB

16

modulation is, according to the ATSC A/65 standard, exclusively used in terrestrial broadcasts. (*See* Doc. 121, Ex. 1, Pierce Decl. Ex. G at 22 tbl. 6.5 (indicating that 8VSB modulation is "Not valid" for cable transmissions, and that two cable modulation formats, 64-QAM and 256-QAM, are "Not valid" for terrestrial broadcast).)

Although the principle of "claim differentiation" could potentially be invoked to argue that K-Tech's claims apply to non-broadcast signals by comparing, for example, claims 1 and 5 of the '903 patent, claim differentiation is a "limited tool" in claim construction. *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1378 (Fed. Cir. 2006). Particularly, "claim differentiation 'can not broaden claims beyond their correct scope'" as described in the overall context of the specification. *Id.* at 1381 (quoting *Fantasy Sports Props. v. Sportsline.com*, 287 F.3d 1108, 1115-16 (Fed. Cir. 2002)). Where, as here, the specification "consistently, and without exception" describes an interpretation different from that suggested by claim differentiation, the specification controls. *See id.* at 1379-81; *see also Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("Different terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper."). Moreover, claims to two different VSB modulation formats (8-VSB and 16-VSB, in '903 claims 8-9, 31-32, 42-43) suggest that different modulations, such as QAM used in digital cable and known in the art, could have been, but were not, claimed.

Therefore, this court should interpret "digital television signal" ('903 claims 1, 5, 8, 10) and "digital television RF signal" ('533 claims 11-12) as a broadcast digital television signal.

*2. "Channel Data," "Attributes for a Virtual Channel," and "Virtual Channel Table" ('903 Claims 1, 5, 8, 10; '533 Claim 1-3, 11-12; '893 Claims 1, 9, 13-15)*

The K-Tech patents relate to modifying PSIP information in a digital television broadcast signal. Included in the PSIP table is a subtable called the "Virtual Channel Table" or "VCT." (*See, e.g.*, Doc. 1. p. 40, col. 2: 2-5.) The ATSC A/65 standard defines separate table formats for broadcast (or "terrestrial") signals and those used for cable: "This document describes tables that shall be applicable to terrestrial (over-the-air) and cable signals. Some PSIP tables apply to terrestrial broadcast, some apply to cable, and others apply to both." (Doc. 121, Ex. 1, Pierce Decl. Ex. G at 1.) Specifically, the standard distinguishes between a broadcast stream with a "Terrestrial Virtual Channel Table (TVCT)" and the cable stream with a "Cable Virtual Channel Table (CVCT)." (*Id.* at 1-2.) The detailed definitions of the TVCT and CVCT are accordingly different. (*See id.* at 20, 26.)

As discussed above, the K-Tech patents are exclusively described as processing digital television signals for broadcast standards. The data tables associated with a digital television signal or transport stream would therefore be formatted to comply with the terrestrial broadcast standards. The fact that the K-Tech patents use "VCT" instead of "TVCT" does not provide for a more general interpretation, because the VCT is "also referred to as the Terrestrial VCT (TVCT)" in the A/65 documents describing terrestrial operation. (*Id.* at 70; *see also id.* at 72 ("The minimum amount of information required in an ATSC terrestrial digital Transport Stream is the VCT [and seven other tables].").)

Accordingly, this court should interpret "channel data" ('903 claims 1, 5, 8, 10), "attributes for a virtual channel" ('533 claims 1-3, '893 claims 1, 9, 13-15), and "virtual channel table" ('533 claims 11-12) as channel data formatted for broadcast digital television.

C.     Defendants' Products Produce Digital Television Signals for Cable.

All of the devices manufactured by Defendants **output** a signal that is modulated for transmission over cable. (Doc. 76-4, Miller Decl. ¶ 8; Doc. 78-1, Koogler Decl. ¶¶ 9–11.) During the processing of these signals, all PSIP data, including channel data and virtual channel tables, is maintained in a format consistent with multiplexing and transmission over a cable system according to cable standards, and not according to broadcast standards. The question of infringement presented herein is not impacted by the format of **inputs**, which for cable companies may be of a variety of formats from baseband, satellite, broadcast, cable, MMDS, or the like, and may be analog or digital in format.

All of the independent claims asserted by K-Tech require either production of a "digital television signal" or manipulation of "channel data" or "attributes of a virtual channel." As discussed above, those claim terms refer to broadcast digital television signals and channel data formatted for broadcast television. Accordingly, Defendants' cable products do not literally infringe those claims. (Doc. 76-4, Miller Decl. ¶ 9; Doc. 78-1, Koogler Decl. ¶¶ 9–11.) Because infringement of a dependent claim requires infringement of the claims they depend on, none of the dependent claims asserted by K-Tech in the motion are literally infringed, either. (Doc. 76-4, Miller Decl. ¶ 9; Doc. 78-1, Koogler Decl. ¶ 11.)

## IV.   CONCLUSION

There is no genuine dispute as to the validity of the patents. The patents-in-suit are invalid. K-Tech has admitted that it does not know how prior art devices could have functioned without using K-Tech's alleged invention. Regarding literal infringement, the claims are limited to processing signals for broadcast television, not for cable. Accordingly, there is no dispute that, under this interpretation, Defendants' cable devices do not infringe.

19

Respectfully submitted,

DATED:  July 29, 2013

s/Frank C. Corso
Frank C. Corso (*pro hac vice*)
CORSO LAW LLC
492 Winthrop Street, Suite 5
Rehoboth, MA 02769
Tel: (774) 901-2677 ext. 303
E-mail: fcc@corsolaw.com

Steven R. Parminter (SBN 90115)
Jennifer J. Moon (SBN 186201)
Wilson Elser Moskowitz Edelman &
Dicker LLP
555 Flower Street - Suite 2900
Los Angeles, CA  90071-2407
Tel:  (213) 443-5100
Fax: (213) 443-5101
E-mail:
Steven.Parminter@wilsonelser.com
E-mail:
Jennifer.moon@wilsonelser.com

*Attorneys for Defendant RLD 69 LLC*
*f/k/a R.L. Drake, LLC*

s/John C. McNett
John C. McNett (*pro hac vice*)
William A. McKenna (*pro hac vice*)
Blake R. Hartz (*pro hac vice*)
WOODARD, EMHARDT,
MORIARTY, MCNETT & HENRY
LLP
111 Monument Circle, Suite 3700
Indianapolis, Indiana 46204
Telephone: (317) 634-3456
E-Mail: jmcnett@uspatent.com
E-Mail: wmckenna@uspatent.com
E-Mail: bhartz@uspatent.com

Jennifer J. Moon (SBN 186201)
Wilson Elser Moskowitz Edelman &
Dicker LLP
555 Flower Street - Suite 2900
Los Angeles, CA  90071-2407
Tel:  (213) 443-5100
E-mail:
Jennifer.moon@wilsonelser.com

*Attorneys for Defendants*
*Blonder Tongue Laboratories, Inc. and*
*R.L. Drake Holdings, LLC*

Memorandum in Support of Defendants' Motion for Partial Summary Judgment

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2013, a copy of the foregoing was served

via email, by the Court's electronic filing system, on the following:

Patrick F. Bright (SBN 68709)
WAGNER, ANDERSON & BRIGHT, PC
3541 Ocean View Boulevard
Glendale, California  91208
E-mail:  pbright@patentattorney.us


                                    s/John C. McNett
                                      John C. McNett