1  John C. McNett (*pro hac vice*)
2  William A. McKenna (*pro hac vice*)
   Blake R. Hartz (*pro hac vice*)
3  Woodard, Emhardt, Moriarty, McNett & Henry LLP
   111 Monument Circle, Suite 3700
4  Indianapolis, Indiana 46204
   Telephone: (317) 634-3456
5  E-Mail: jmcnett@uspatent.com
6  E-Mail: wmckenna@uspatent.com
   E-Mail: bhartz@uspatent.com
7
8  Jennifer J. Moon (SBN 186201)
   Wilson Elser Moskowitz Edelman & Dicker LLP
9  555 Flower Street - Suite 2900
   Los Angeles, CA 90071-2407
10 Tel: (213) 443-5100
   E-mail: Jennifer.moon@wilsonelser.com
11
   *Attorneys for Defendants*
12 *Blonder Tongue Laboratories, Inc. and*
   *R.L. Drake Holdings, LLC*
13

14            UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
15                 WESTERN DIVISION
16

| | |
|---|---|
| 17 K-TECH<br>TELECOMMUNICATIONS, INC., | CASE NO. CV12-05316 RGK (RZx) |
| 18 | **MEMORANDUM IN OPPOSITION** |
| 19                         Plaintiff, | **TO PLAINTIFF K-TECH**<br>**TELECOMMUNICATIONS, INC.'S** |
| 20 vs. | **MOTION FOR PARTIAL**<br>**SUMMARY JUDGMENT***  |
| 21 | |
| 22 BLONDER TONGUE<br>LABORATORIES, INC.; R.L. | Date:      August 26, 2013 |
| 23 DRAKE HOLDINGS, LLC; R.L.<br>DRAKE, LLC; AND RLD '69, LLC, | Time:      9:00 AM<br>Place:     Court Room 850 |
| 24 | Judge R. Gary Klausner |
| 25                         Defendants. | |
| 26 | |

#963705

27 *This is an un-redacted re-filing of Documents 93 and 103 (and Exhibits) after
28 the Court ruled that these papers should not be filed under seal in Document 114.

i

1  Defendants Blonder Tongue Laboratories, Inc. and R.L. Drake Holdings,

2  LLC (collectively "Blonder Tongue") hereby oppose Plaintiff K-Tech

3  Telecommunications, Inc.'s ("K-Tech") Motion for Summary Judgment and

4  Dismissal of Affirmative Defenses (Document 67).

5

6  ## TABLE OF CONTENTS

7
I.    LEGAL STANDARDS ................................................................................1

8      A.    Summary Judgment Is Only Proper Absent Genuine Disputes..............1

9
10     B.    Previously Known Inventions Are Unpatentable. ...................................1

11     C.    Obvious Variations on the Prior Art Are Unpatentable...........................2

12
13     D.    Rule 30(b)(6) Deposition Statements Bind the Organization..................2

14  II.    K-TECH'S PATENTS CLAIMS ARE ANTICIPATED BY OR ARE

15  OBVIOUS VARIATIONS ON THE IDEAS OF OTHERS, AND ARE

16  INVALID.................................................................................................................3

17
18     A.    Digital Television Signals Include Descriptive Data Like PSIP. ............3

19     B.    The Claims Were Previously Invented By, Obvious to, or

20           Published By Others...............................................................................4

21
22           1. Zenith Invented Earlier, Rendering K-Tech's Claims Invalid.................4

23           2. Divicom Invented Earlier, Rendering K-Tech's Claims Invalid. ............7

24
25           3. Thomcast Invented and Published Earlier, Rendering K-Tech's

26           Claims Invalid. ........................................................................7

27

28

C.    The Claims Are an Obvious Application of New Standards
      Definitions to Existing Technology. ........................................8

D.    K-Tech Cannot Think of Any Way Prior Art Devices Function
      Without Using the Invention. ................................................10

III.    BLONDER TONGUE'S CABLE DEVICES DO NOT INFRINGE. ........12

A.    Infringement Determinations Require Claim Construction. .................13

B.    K-Tech's Approach to Claim Construction Is Flawed. .........................14

C.    The Claims Relate to Digital Television Signals for Broadcast. ...........15

      1. "Digital Television [RF] Signal" ('903 Claims 1, 5, 8, 10; '533
         Claims 11-12) ...............................................................16

      2. "Channel Data," "Attributes for a Virtual Channel," and "Virtual
         Channel Table" ('903 Claims 1, 5, 8, 10; '533 Claim 1-3, 11-12;
         '893 Claims 1, 9, 13-15) .................................................18

D.    Blonder Tongue's Products Produce Digital Television Signals
      for Cable. .....................................................................19

E.    K-Tech's Proof Is Defective. ................................................20

V.    CONCLUSION .........................................................................20

Memorandum in Opposition to K-Tech's Motion for Partial Summary Judgment

# **TABLE OF AUTHORITIES**

## **Cases**

*Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1037 (Fed. Cir. 2001) .....2

*Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347, 51 U.S.P.Q.2d 1943, 1947 (Fed. Cir. 1999).................................................................................................1

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)1

*Centillion Data Sys., Inc. v. Am. Mgmt. Sys., Inc.*, 138 F. Supp. 2d 1117 (S.D. Ind. 2001) ...................................................................................................15

*Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n*, 54 F.3d 756, 762 (Fed. Cir. 1995) ....................................................................................................2

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006) ........................................................................................................17

*DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314 (Fed. Cir. 2001).................15

*Ecclesiastes 9: 10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146 (10th Cir. 2007) .............................................................................................2

*Fantasy Sports Props. v. Sportsline.com*, 287 F.3d 1108, 1115-16 (Fed. Cir. 2002) ...................................................................................................17

*Fox Group, Inc. v. Cree, Inc.*, 700 F.3d 1300, 1306 (Fed. Cir. 2012) ...................1

*In re Paulsen*, 30 F.3d 1475, 1479, 31 U.S.P.Q.2d 1671, 1673 (Fed. Cir. 1994)...1

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007)....................................................................................................2

*Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364 (Fed. Cir. 2003)...................14

*LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364 (Fed. Cir. 2006)...............14

*Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996) ................................................................................13

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ...............13

*Maytag Corp. v. Electrolux Home Products, Inc.*, 411 F. Supp. 2d 1008 (N.D.
  Iowa 2006) ................................................................................................ 15

*MySpace Inc. v. GraphOn Corp.*, 672 F.3d 1250 (Fed. Cir. 2012) ...................... 13

*Nystrom v. Trex Co., Inc.*, 424 F.3d 1136 (Fed. Cir. 2005) ................................ 17

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .......................... 13, 14, 15

*QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012) ........ 3

*Quanta Comp., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 128 U.S. 2109, 170 L. Ed.
  2d 996 (2008) ........................................................................................... 14

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002) ...................... 1

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ................ 14

*Welker Bearing Co. v. PHD, Inc.*, 528 F. Supp. 2d 683 (E.D. Mich. 2007) ......... 14

**Statutes**

35 U.S.C. § 102 (2012) ................................................................... 1, 2, 7, 8

35 U.S.C. § 103 (2012) ............................................................. 1, 2, 7, 8, 10

**Rules**

Fed. R. Civ. P. 56 ................................................................................ 1

# I.    LEGAL STANDARDS

## A.    Summary Judgment Is Only Proper Absent Genuine Disputes.

Summary judgment is proper only where the evidence "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While the non-movant must affirmatively present specific evidence sufficient to create a genuine issue of material fact, in considering a motion for summary judgment, the court "must draw all reasonable inferences supported by the evidence in favor of the non-moving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

## B.    Previously Known Inventions Are Unpatentable.

Claims are invalid if they are either anticipated or obvious in view of the prior art. 35 U.S.C. §§ 102, 103 (2012)).[1] If all of the elements of a claim are found in a single reference, then the claim is invalid as being "anticipated" by the prior art reference. *In re Paulsen*, 30 F.3d 1475, 1479 (Fed. Cir. 1994). A reference is considered to disclose the subject matter that is either expressly or inherently disclosed in that document. *Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347 (Fed. Cir. 1999).

Furthermore, a claim is invalid if, prior to the alleged invention, "the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g)(2). Commercialization is one "convenient way[]" to prove an invention has been disclosed to the public, rather than abandoned, suppressed, or concealed. *Fox Group, Inc. v. Cree, Inc.*, 700 F.3d 1300, 1306 (Fed. Cir. 2012). "[R]easonable efforts to bring the invention to market" negate any inference that the invention was abandoned, suppressed, or

---

[1] Sections 102 and 103 of Title 35 were significantly amended as part of the America Invents Act of 2011 ("AIA"). The pre-AIA versions apply to K-Tech's claims, and all references herein are to the prior versions.

1 concealed. *Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n*, 54 F.3d 756, 762

2 (Fed. Cir. 1995). Such reasonable efforts can span several years. *See id.* (four

3 years). At summary judgment, the party asserting a § 102(g) defense need only

4 show prior invention, which shifts the burden of production to the patentee to

5 create an issue about whether the prior inventor suppressed or concealed. *Apotex*

6 *USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1037 (Fed. Cir. 2001).

7           C.    Obvious Variations on the Prior Art Are Unpatentable.

8           If a claim is an obvious variation of a prior reference, or an obvious

9 combination of elements found in prior references, it is invalid under § 103. *KSR*

10 *Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705

11 (2007). In short, a "combination of familiar elements according to known

12 methods is likely to be obvious when it does no more than yield predictable

13 results." *Id.* at 416. And while an explicit teaching, suggestion, or motivation is a

14 "helpful insight" in the obviousness analysis, "a court can take account of the

15 inferences and creative steps that a person of ordinary skill in the art would

16 employ," *KSR*, 550 U.S. at 418, and should not "deny factfinders recourse to

17 common sense," *id.* at 421.

18           D.    Rule 30(b)(6) Deposition Statements Bind the Organization.

19           Corporations have an affirmative duty to provide a witness who can

20 provide complete, knowledgeable, and binding testimony on the corporation's

21 behalf. *Ecclesiastes 9: 10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1146

22 (10th Cir. 2007). Thus, an organization that does "not provide a well-prepared

23 witness for its 30(b)(6) witness . . . will be bound by his deposition at trial and

24 will not be allowed to enlarge his testimony at trial regarding information he

25 professed not to know during his deposition." *Newport Elecs., Inc. v. Newport*

26 *Corp.*, 157 F. Supp. 2d 202, 213 (D. Conn. 2001).

27           Similarly, "the lack of knowledge answer is itself an answer which will

28 bind the corporation at trial" and "a corporation which provides a 30(b)(6)

designee who testifies that the corporation does not know the answers to the questions 'will not be allowed to change its answer by introducing evidence at trial.'" *QBE Ins. Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012) (citation omitted); *id.* at 700 ("QBE is precluded from taking a position at trial, including the introduction of testimony and exhibits, on those issues for which Mr. O'Brien was unable to provide 30(b)(6) testimony."); *see also id.* at 687-691 (outlining the purposes and doctrine regarding Rule 30(b)(6)).

Steve Kuh was produced as the designated witness for the July 9, 2013 deposition of K-Tech, on all noticed topics. (Ex. 5, K-Tech Dep. 11: 1-4.) Kuh had not seen the deposition topics prior to the start of the deposition (*id.* at 10:12-24), and did no preparation (*e.g.*, *id.* at 179:4-21). K-Tech cannot now provide contrary positions for topics which it was not knowledgeable about at deposition.

## II. K-TECH'S PATENTS CLAIMS ARE ANTICIPATED BY OR ARE OBVIOUS VARIATIONS ON THE IDEAS OF OTHERS, AND ARE INVALID.

### A. Digital Television Signals Include Descriptive Data Like PSIP.

Digital television signals travel through the air or over wired connections as a waveform. The waveform can be converted to a stream of bits through a process called demodulation. (Conversely, bits can be converted to a waveform by modulation.) In most digital television signal formats, these bits are in a compressed format based on MPEG-2. MPEG-2 is a standard transmission format that contains packetized information for audio, video, and data related to the audio and video sent in the transport stream. The process of separating out various packets from a stream is generally called demultiplexing. (Conversely, combining various packets is multiplexing.)

The American Television Systems Committee (ATSC) approved, in December 1997, standard A/65 defining Program and System Information Protocol (PSIP) information for digital television. (Ex. 1, Pierce Decl. ¶ 9 and Ex.

G.)  PSIP is "a collection of hierarchically-associated tables each of which describes particular elements of typical digital TV services." (*Id.* Ex. G at 69.) Included in PSIP is a Virtual Channel Table (VCT) which contains a list of all the channels available in the Transport Stream" and attributes such as major and minor channel numbers and carrier frequencies. (*Id.* Ex. G at 75-76; Doc. 1, p. 40 ['903 Patent], col. 1:65–2:18.) New to this standard was the adoption of the use of "major and minor channel numbers."

> B.     The Claims Were Previously Invented By, Obvious to, or Published By Others.

> *1. Zenith Invented Earlier, Rendering K-Tech's Claims Invalid.*

Employees of Zenith Electronics Corp. invented a Zenith Baseband PSIP Fixer Translator at least as early as February 1999. (*See* Ex. 3, Frahm Decl. ¶ 7, Ex. C). This is before any dated invention evidence of the K-Tech patents, and includes the limitations of the asserted claims of the K-Tech patents, assuming K-Tech's positions on claim scope. The Zenith system includes an ATSC demodulator that converts a digital television signal into a transport stream, a Baseband PSIP Fixer that modifies a major channel number, minor channel number, or carrier frequency in an incoming PSIP VCT to generate a new PSIP VCT, and an ATSC Modulator that converts the transport stream into an IF (intermediate frequency) signal that is then up-converted to RF (radio frequency). (Ex. 3, Frahm Decl. ¶ 7 & Ex. C; Ex. 1, Pierce Decl. ¶ 25.) This document teaches or renders obvious every element of the asserted claims as construed by K-Tech, and detailed claim charts are provided in Ex. K to the Pierce Declaration (Ex. 1), at pages 38-51 to illustrate this fact. K-Tech testified that it does not know how the Zenith invention differs from its patents:

> Q. Okay. And there are two changes to the terrestrial virtual channel
> table that you think it probably means. What are those two possible
> changes or three, depending on how you want to look at it?

A. It's written here that carrier frequency, major and minor channel numbers are possible changes to the PSIP TVCT.

Q. Okay. Isn't that pretty much what's in your patent?

A. I don't know.

Q. You don't know what's in your patent?

A. Please -- please be specific.

Q. Does your patent discuss changing the VCT carrier -- carrier frequency?

A. Can you re -- restate the question?

Q. Does your patent discuss changing the VCT carrier frequency in the PSIP data?

A. Yes.

Q. Does your patent discuss changing major and minor channel numbers in the VCT in the PSIP?

A. Yes.

Q. Okay. So the question is how is this any different than what is shown in your patent in that regard?

A. I don't know.

(Ex. 5, K-Tech Dep., at 175: 25–176:25.)[2] Of the elements not explicitly found in the PSIP Fixer document, such as an amplifier, those items are either implicitly

_____

[2] K-Tech did not reserve the right to review or correct its deposition during the deposition, nor did K-Tech request a continuance as to any topic. All of the prior art that was the subject of questioning during the deposition had been earlier provided to K-Tech. Topics No. 28 for K-Tech's deposition was "Knowledge of the art from 1997 through 1999, including the 1997 ATSC standard, as well as . . . . Zenith Electronics, (in particular model DTV TRANS-A) . . . . (Ex. 5, K-Tech Dep. Ex. 1, at 12.)

1    present, or are familiar elements that would provide predictable results and

2    therefore be obvious. *KSR*, 550 U.S. at 416; Ex. 1, Pierce Decl. ¶ 25.

3         The Zenith PSIP Fixer document is dated February 1999, well prior to K-

4    Tech's earliest documents or testimony regarding conception or reduction to

5    practice. Zenith began working on a translator project that included a PSIP Fixer

6    by February of 1999. (Ex. 3, Frahm Decl. ¶ 7.) K-Tech does not know of any

7    documents supporting an invention date prior to November 1999:

8         Q. Okay. Is this November 18th, 1999, date the earliest dated

9         document that relates to this updating of the PSIP that you're aware of

10        from Ktech?

11        A. I don't know.

12        Q. Can you -- I take it, then, you can't think of any earlier documents?

13        A. I don't know.

14   (Ex. 5, K-Tech Dep. 88: 1-7.[3]) Thus, Zenith's PSIP Fixer is a prior invention.

15        Zenith's PSIP Fixer invention was later embodied in model DTV-TRANS-

16   4 that was sold to LG Electronics in March 2000 and marketed at the National

17   Association of Broadcasters Convention in April 2000. (Ex. 3, Frahm Decl. ¶¶ 4-

18   8 & Exs. A, B.) K-Tech has admitted that the Zenith's ATSC VSB Translator was

19   marketed at the convention. (Ex. 4, File History Excerpt, at 1.)

20        From April 1999 until the product was shipped in March 2000, Zenith

21   worked continuously to develop, implement, and test a product including the

22   features shown in ZEN000008, including the remapping of virtual channel tables

23

24   [3] Topics No. 3 for K-Tech's deposition was "The conception and reduction to

25   practice of a digital television translator with a PSIP update unit, including the

26   alleged date of conception, the specific date of reduction to practice, . . . and the

27   documents corroborating or otherwise related to K-Tech's conception and/or

28   reduction to practice of these devices and processes. . (Ex. 5, K-Tech Dep Ex. 1 at 12.)

in a television broadcast translator. (Ex. 3, Frahm Decl. ¶ 7-8.[4]) The thirteen months "from conception to delivery to a customer, for a company the size of Zenith, was a remarkable accomplishment." (Ex. 3, Frahm Decl. ¶ 8.) Therefore Zenith could not have abandoned, suppressed, or concealed the invention. K-Tech's asserted claims are thus invalid under §§ 102(g) and 103(a).

### 2. Divicom Invented Earlier, Rendering K-Tech's Claims Invalid.

In 1998, DiviCom, Inc. began preparing to implement a Program Information Table Manager (PIT) that could manipulate PSIP. (Ex. 1, Pierce Decl. ¶ 11.) This device would, when combined with other standard components, receive an incoming stream having a Virtual Channel Table and subsequently generate an outgoing stream having a different Virtual Channel Table from that of the incoming stream. (*Id.*) Divicom promoted and offered such a system for sale to customers in 1998 and 1999 (*id.* at ¶¶ 13-15, 18), and started implementing the system in early 1999 (*id.* at ¶ 17). As shown in the charts attached as Ex. K (pages 2-15 of the charts) to the Pierce Declaration (Ex. 1), this DiviCom system anticipates or renders obvious all of the claims asserted by K-Tech. Therefore, K-Tech's asserted claims are invalid under §§ 102(g) and 103(a).

### 3. Thomcast Invented and Published Earlier, Rendering K-Tech's Claims Invalid.

Still further, an article published at least by April 22, 1999 anticipates, under § 102(a)[5], several of K-Tech's much later claims to *changing digital television channel assignments for broadcast.* (See Ex. 1, Pierce Decl. ¶ 24.) In

---

[4] Further evidence of the development effort is in Ex. 2, Kail Decl., Ex. A.

[5] "A person shall be entitled to a patent unless . . . the invention was . . . described in a printed publication in this or a foreign country, before the invention thereof by the applicant . . . ." 35 U.S.C. § 102(a) (2012).

1  *Implementing PSIP Solutions* by Pierre Clement et al. ("Clement"), a digital head-

2  end system is described which receives signals from multiple broadcasters. (Ex.

3  1, Pierce Decl. Ex. F, at 5-6.) In order to resolve possible conflicts in information

4  received from the two broadcasters, "some proper tables are to be reconstructed

5  from the incoming PSIP tables." (*Id.* at 6, col. 2.) Clement also recognizes that

6  "the VCT as well as in the MGT parameters related to transportation may need to

7  be changed. . . . [T]he frequencies . . . may also be affected." (*Id.* at 7, col. 2.)

8      Clement's teachings describe a system that equates to "a digital television

9  translator that updates the PSIP table with proper channel and carrier frequency

10  information." ('903, Summary of the Invention, Doc. 1, p. 40, col. 2: 50-55.) As

11  shown in the charts attached as Ex. K to the Pierce Declaration (Ex. 1), Clement

12  teaches all of the elements of claims 1, 5, 8 of the '903 patent, claims 1-3 of the

13  '533 patent, and claim 1, 9, 13-15 of the '893 patent (pages 28-37 of the charts).

14  The other claims are obvious over Clement in combination with well-known and

15  universally applied technologies such as power amplifiers. (*See id.*) The claims

16  are invalid under §§ 102(a) and 103(a).

17      C.    The Claims Are an Obvious Application of New Standards

18            Definitions to Existing Technology.

19      Invalidity is also demonstrated using the Cartwright et al. patent, U.S. Pat.

20  No. 6,438,171 (Ex. 1, Pierce Decl. Ex. J)[6] in light of the ATSC standards. The

21  ATSC standards are based on European "DVB" standards that include System

22  Information (SI) and Program Specific Information (PSI) tables that relate to

23  channel assignments. (Ex. 1, Pierce Decl. ¶ 23.). The Cartwright et al. patent

24

25  ─────────────

26  [6] Cartwright was assigned to Tandberg Television, and filed in the U.S. in 1997 and published in 1999. Topics No. 28 for K-Tech's deposition was "Knowledge

27  of the art from 1997 through 1999, including the 1997 ATSC standard, as well as technology from . . . . Tandberg, now Ericsson, . . . ." (Ex. 5, K-Tech Dep. Ex. 1

28  at 12.)

suggests providing different SI and PSI at output to avoid conflicts in channel assignments (Ex. 1, Pierce Decl. Ex. J at col. 1:41-54; col. 2:7-12; col. 2:25-33.)

Cartwright teaches processing of "tables of data each of which carries information about particular parameters, e.g. about the network that the signal is carried on" (Ex. 1, Pierce Decl. Ex. J at col. 1: 15-22),"the data processor 16 uses information in the tables extracted from the transport stream by the block 15 and information entered by the operator . . . and generates new reprocessed tables which are supplied to the buffer to be multiplexed with the output from the buffer 18." (*Id.* at col. 3: 44-49.) Once the ATSC A/65 standard was adopted in the United States in 1997, including the virtual channel table (VCT) (i.e. "information… about the network that the signal is carried on") the implementation of the Cartwright technology in the United States predictably results in the very inventions that K-Tech's later sought to patent. (Ex. 1, Pierce Decl. ¶ 23.).  Element-by-element comparison to the Cartwright patent is provided in the charts of Ex. K to the Pierce Declaration (Ex. 1) (pages 16-27 of the charts). K-Tech admits that it does not know how to distinguish the Cartwright reference:

> Q. In this particular patent, it talks about modifying data.
>
> And my question is -- if you look at the abstract, the last sentence, "The constantly updated tables in the input stream are only modified [sic] in respect of the local changes and the updates are passed through to the output stream."
>
> Isn't that the same thing that your PSIP update does in your patent?
>
> A. I don't know.
>
> Q. Can you think of any arguments that might differentiate that from what you do with your PCIP – PSIP update?
>
> A. I don't know.

Q. Okay. Let's look at Column 3, if you can. There is a paragraph that

starts "the data processor 16." And I'd ask if you see any difference

from that description when compared with what is done in the

products that you make under Defendants' Exhibit 2[7]?

A. I don't know.

(Ex. 5, K-Tech Dep. at 146: 6–147: 1.)[8] The claims are invalid under § 103(a).

### D.    K-Tech Cannot Think of Any Way Prior Art Devices Function Without Using the Invention.

K-Tech's patents claim invention in *changing digital television channel assignments for broadcast*. As shown by Howdy Pierce's declaration, K-Tech's patent claims were anticipated by prior art devices, prior art publications, prior art offers for sale, and prior invention, or were obvious from that prior art. (Ex. 1, Pierce Decl. ¶¶ 21-25, Ex. L.) In order to comply with the PSIP standards adopted in 1997, devices offered for sale in 1998 and thereafter that implemented this standard and allowed for multiplexing of multiple input streams "would receive an incoming stream having a Virtual Channel Table and subsequently generate an outgoing stream having a different Virtual Channel Table from that of the incoming stream." (Ex. 1, Pierce Decl. ¶ 11.) This is the same function that K-Tech much later attempted to patent when it wrote claims on *changing digital television channel assignments for broadcast*.

A Lucent Digital Video product announced in March 1999 that it was demonstrating PSIP software with "the ability to remap channel numbers, which is important for branding as stations make the transition to digital." (Ex. 5, K-Tech Dep. Ex. 13, at 1.) This device appears to embody the asserted claims. (Ex.

---

[7] Exhibit 2 in the deposition was a list of K-Tech model numbers, with sales figures by year, that allegedly embody (or "implement") the K-Tech patents. (Ex. 5, K-Tech Dep. 30: 17-22, 31: 18–32: 1.)

[8] See Footnote 6 above.

1, Pierce Decl. ¶ 22.) K-Tech does not know how this differs from the VCT manipulation taught in the patents-in-suit:

> Q. Okay. This talks about their PSIP software that has the ability to remap channel numbers. Wouldn't that necessarily involve the changing of the virtual channel tables in PSIP --
>
> A. I don't know.
>
> Q. -- for this PSIP software?
>
> A. I don't know.
>
> Q. Can you think of any other way that it could accomplish that end?
>
> A. I don't know.

(Ex. 5, K-Tech Dep., at 128: 25–129: 9.)[9]

Scientific Atlanta's PowerVu Stream Guide, publically described at least as early as April 5, 1999, is described as delivering "program services information protocol (PSIP) according to ATSC A165 [sic] standard" and supporting "passthrough, modification, and complete replacement of tables allowing local identity by the Broadcaster." (Ex. 1, Pierce Decl. Ex. H, at 2.) As with the Lucent system, this product appears to embody the asserted claims. (Ex. 1, Pierce Decl. ¶ 22.)

In *Transmultiplexing, Transcontrol and Transscrambling of MPEG-2/DVB Signal* by Bungum ("Bungum"), the author discusses "transmultiplex[ing] signals from several different sources to make up a new transport stream in a cost-effective and DVB compliant way." (Ex. 5, K-Tech Dep. Ex. 16, at 1.) Bungum describes changes in a Network Information Table (NIT) such as "network name,

---

[9] Topics No. 28 for K-Tech's deposition was "Knowledge of the art from 1997 through 1999, including the 1997 ATSC standard, as well as technology from . . . . Scientific Atlanta, . . . ." (Ex. 5, K-Tech Dep. Ex. 1 at 12.)

the delivery system descriptor (with physical parameters for the multiplex as frequency etc.)" that "take place if for example a cable network is moving a multiplex from one channel to another." (*Id.* at 3.) An output signal contains "services from the different input transport streams together with the regenerated PSI and SI tables." (*Id.*) This is, effectively, a channel remapping function, although not formatted as PSIP. K-Tech does not dispute this:

> Q. Apart from the fact that it is for a DVB system as opposed to an ATSC system, are there any differences between what's described in that paragraph and your PSIP update that's shown in your patents?
>
> A. I don't know.
>
> Q. In your patent, you regenerate a PSIP signal table, I should say? The VCT table?
>
> A. Yes.
>
> Q. Okay. Is that any different than the regeneration of the SI tables described in this article?
>
> A. I don't know.

(Ex. 5, K-Tech Dep. at 151: 10-20.)[10]

These and other prior art publications, patents, and products render K-Tech's patents invalid, or at the very least, raise substantial questions of fact that cannot be resolved in K-Tech's favor on summary judgment.

## III.    BLONDER TONGUE'S CABLE DEVICES DO NOT INFRINGE.

Construed properly, the claims asserted in K-Tech's motion are to systems for changing conflicting digital television channel assignments for broadcast.

---

[10] The Bungum reference describes a Tandberg product. See footnote 6.

Because Blonder Tongue's products are related to signal processing equipment for cable transmission, and not broadcast, the products do not infringe.

A.    Infringement Determinations Require Claim Construction.

A patent infringement analysis is a two-step process. "The first [step] is determining the meaning and scope of the patent claims asserted to be infringed . . . . The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc).

Claim construction is a question of law to be decided by the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). The Federal Circuit's seminal *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) provides the framework for doing so.  Claims "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312-13. The person of ordinary skill in the art reads the claim term "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Recently, the Court has restated this as "two limiting factors" for claim construction, "what was invented" as determined by the specification, and "what exactly was claimed" as determined by the specific claim language. *MySpace Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1256 (Fed. Cir. 2012).

In interpreting the claims, the Court should primarily look to intrinsic evidence, which includes the claim language, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1312-17. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315. "Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary

13

artisan after reading the entire patent." *Id.* at 1321. "[T]he prosecution history can often inform the meaning of the claim language" and includes the prior art cited during the examination of the patent. *See id.* at 1317. Thus, "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *Kumar v. Ovonic Battery Co., Inc.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003).  Similarly, even if a patent does not "expressly adopt" definitions in an industry standard, "that standard remains relevant in determining the meaning of the claim term to one of ordinary skill in the art at the time the patent application was filed, and it is treated as intrinsic evidence for claim construction purposes." *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1375 (Fed. Cir. 2006), *rev'd on other grounds sub nom. Quanta Comp., Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 128 U.S. 2109, 170 L. Ed. 2d 996 (2008).

Extrinsic evidence (i.e., everything that isn't intrinsic) can shed light on the relevant art, but where the meaning of the claim is clear based on the intrinsic evidence, it is improper to rely on extrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). "In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." *Id.*

B.    K-Tech's Approach to Claim Construction Is Flawed.

K-Tech asserts that no claim terms or phrases require construction beyond an "ordinary meaning" and provides no guidance on what such an ordinary meaning would be.  K-Tech's approach aids neither the Court in interpreting, nor the jury in understanding, the technology at issue. *See, e.g.*, *Welker Bearing Co. v. PHD, Inc.*, 528 F. Supp. 2d 683, 693-94 (E.D. Mich. 2007) ("To the extent that Plaintiff means to suggest that judicial claim construction is unnecessary so long as the parties agree that a claim's terms should be given their 'ordinary meaning,' this unduly discounts the capacity of patent litigants to argue over what this

'ordinary meaning' should be."); *Maytag Corp. v. Electrolux Home Products,
Inc.*, 411 F. Supp. 2d 1008, 1037-38 (N.D. Iowa 2006) ("[P]arties in patent cases
rarely agree on the 'ordinary meaning [of claim terms] as understood by a person
of skill in the art,' so . . . asserting that such a meaning should apply, without
further construction, merely begs the question of what that meaning is.");
*Centillion Data Sys., Inc. v. Am. Mgmt. Sys., Inc.*, 138 F. Supp. 2d 1117, 1121
(S.D. Ind. 2001) (rejecting "ordinary meaning" invocation because it "ignores
what is often the crux of parties' *Markman* disputes: disputes over what the
ordinary or accustomed meanings of claim terms are").

Moreover, even when terms have a "plain and ordinary meaning", the
failure to construe such a term is error when multiple "ordinary" meanings exist
or when reliance on an "ordinary" meaning does not resolve the parties' dispute.
*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361
(Fed. Cir. 2008). Additionally, the Federal Circuit has instructed that ascertaining
an ordinary meaning requires application of the standard claim construction
principles: "We cannot look at the ordinary meaning of the term . . . in a vacuum.
Rather, we must look at the ordinary meaning in the context of the written
description and the prosecution history." *Phillips*, 415 F.3d at 1313 (quoting
*DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314 (Fed. Cir. 2001)).

C.    The Claims Relate to Digital Television Signals for Broadcast.

Blonder Tongue submits that several claim terms require construction prior
to determination of the infringement issue. First, the claim terms "digital
television signal" ('903 claims 1, 5, 8, 10) and "digital television RF signal" ('533
claims 11-12) refer to broadcast digital television signals. Second, the terms
"channel data" ('903 claims 1, 5, 8, 10) or "attributes for a virtual channel" ('533
claim 1-3; '893 claims 1, 9, 13-15) or "virtual channel table" ('533 claims 11-12)
refer to channel data formatted for broadcast digital television. K-Tech claims to

1  have invented the changing of conflicting digital television channel assignments

2  for broadcast.

3       Because the specifications for the asserted patents are nearly identical, for

4  convenience reference will be made only to the specification of the '903 patent

5  (U.S. Patent 6,785,903, filed in Court as Document 1, pages 34-45). Moreover,

6  because the '903 patent refers to compliance with the ATSC A/65 standard and

7  the standard is included in the prosecution history, the A/65 standard also

8  constitutes intrinsic evidence.[11]

9       *1. "Digital Television [RF] Signal" ('903 Claims 1, 5, 8, 10; '533 Claims*

10  *11-12)*

11       The K-Tech patents consistently refer to broadcast or terrestrial digital

12  television signal standards. For example, all translator embodiments include an

13  "8-VSB modulator" labeled 13 (FIG. 2) or 24 (FIG. 4). "8-VSB modulator 13

14  processes the transport stream having the updated PSIP data according to ATSC

15  terrestrial <u>broadcast</u> standards." (Doc. 1, p 42, col. 5: 3-5 (underlining added).)

16  The second embodiment, Figure 4, describes the transport stream that "is then

17  sent to 8-VSB modulator 24 and converted into a DTV signal consistent with the

18  operation <u>as described in the first embodiment</u>." (Doc. 1, p 42, col. 5: 48-51

19  (underlining added).)

20       Similarly, the patents describe the problem of two <u>broadcasters</u> using the

21  same channel numbers in the same geographic regions, which can prevent both

22  broadcasters' signals from being received properly (Doc. 1, p 40, col. 2: 37-47.)

23  A solution supposedly provided by the translator invention is a change to the

24  channel number of one signal when a broadcaster "may be licensed to broadcast

25  in the translator's geographical area, but at a different channel." (Doc. 1, p 41,

26

27  [11] Citations to the A/65 Standard will be to Ex. G to the Pierce Declaration, rather

28  than to the prosecution history, in order to eliminate several hundred additional pages of material not currently at issue.

col. 4: 45-47.)  Moreover, the third embodiment (FIG. 6) is a distribution network of translators 31*a*-31*d* shown as broadcasting antennas (*see* Doc. 1, p 42, col. 6: 20-65). While non-broadcast signals can be on the input side of the translator (Doc. 1, p 41,, col. 4: 9-11), the important fact is that *all* signals on the output side of the translator are in a form for broadcasting.

An examination of the claims confirms that the claims are limited to producing digital television signals at an output that are for broadcast. For example, the '903 claims consistently refer to terrestrial or broadcast standards to produce the "digital television signal" (claims 5, 28, 39), video data "that conforms to the USA terrestrial digital television broadcast standard" (claims 7, 30, 41), or a form of VSB modulation (claims 8-9, 31-32, 42-43). 8VSB modulation is, according to the ATSC A/65 standard, exclusively used in terrestrial broadcasts. (*See* Ex. 1, Pierce Decl. Ex. G at 22 tbl. 6.5 (indicating that 8VSB modulation is "Not valid" for cable transmissions, and that two cable modulation formats, 64-QAM and 256-QAM, are "Not valid" for terrestrial broadcast).)

Although the principle of "claim differentiation" could potentially be invoked to argue that K-Tech's claims apply to non-broadcast signals by comparing, for example, claims 1 and 5 of the '903 patent, claim differentiation is a "limited tool" in claim construction. *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1378 (Fed. Cir. 2006). Particularly, "claim differentiation 'can not broaden claims beyond their correct scope'" as described in the overall context of the specification. *Id.* at 1381 (quoting *Fantasy Sports Props. v. Sportsline.com*, 287 F.3d 1108, 1115-16 (Fed. Cir. 2002)). Where, as here, the specification "consistently, and without exception" describes an interpretation different from that suggested by claim differentiation, the specification controls. *See id.* at 1379-81; *see also Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("Different terms or phrases in separate claims

17

may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper."). Moreover, claims to two different VSB modulation formats (8-VSB and 16-VSB, in '903 claims 8-9, 31-32, 42-43) suggest that different modulations, such as QAM used in digital cable and known in the art, could have been, but were not, claimed.

Therefore, this court should interpret "digital television signal" ('903 claims 1, 5, 8, 10) and "digital television RF signal" ('533 claims 11-12) as a broadcast digital television signal.

*2. "Channel Data," "Attributes for a Virtual Channel," and "Virtual Channel Table" ('903 Claims 1, 5, 8, 10; '533 Claim 1-3, 11-12; '893 Claims 1, 9, 13-15)*

The K-Tech patents relate to modifying PSIP information in a digital television broadcast signal. Included in the PSIP table is a subtable called the "Virtual Channel Table" or "VCT." (*See, e.g.,*, Doc. 1. p. 40, col. 2: 2-5.) The ATSC A/65 standard defines separate table formats for broadcast (or "terrestrial") signals and those used for cable: "This document describes tables that shall be applicable to terrestrial (over-the-air) and cable signals. Some PSIP tables apply to terrestrial broadcast, some apply to cable, and others apply to both." (Ex. 1, Pierce Decl. Ex. G at 1.) Specifically, the standard distinguishes between a broadcast stream with a "Terrestrial Virtual Channel Table (TVCT)" and the cable stream with a "Cable Virtual Channel Table (CVCT)." (*Id.* at 1-2.) The detailed definitions of the TVCT and CVCT are accordingly different. (*See id.* at 20, 26.)

As discussed above, the K-Tech patents are exclusively described as processing digital television signals for broadcast standards. The data tables associated with a digital television signal or transport stream would therefore be formatted to comply with the terrestrial broadcast standards. The fact that the K-

18

1 Tech patents use "VCT" instead of "TVCT" does not provide for a more general

2 interpretation, because the VCT is "also referred to as the Terrestrial VCT

3 (TVCT)" in the A/65 documents describing terrestrial operation. (*Id.* at 70; *see*

4 *also id.* at 72 ("The minimum amount of information required in an ATSC

5 terrestrial digital Transport Stream is the VCT [and seven other tables].").)

6      Accordingly, this court should interpret "channel data" ('903 claims 1, 5, 8,

7 10), "attributes for a virtual channel" ('533 claims 1-3, '893 claims 1, 9, 13-15),

8 and "virtual channel table" ('533 claims 11-12) as channel data formatted for

9 broadcast digital television.

10     D.     Blonder Tongue's Products Produce Digital Television Signals for
11            Cable.

12      All of the devices manufactured by Blonder Tongue **output** a signal that is

13 modulated for transmission over cable. (Doc. 76-4, Miller Decl. ¶ 8.) During the

14 processing of these signals, all PSIP data, including channel data and virtual

15 channel tables, is maintained in a format consistent with multiplexing and

16 transmission over a cable system according to cable standards, and not according

17 to broadcast standards. The question of infringement presented herein is not

18 impacted by the format of **inputs**, which for cable companies may be of a variety

19 of formats from baseband, satellite, broadcast, cable, MMDS, or the like, and may

20 be analog or digital in format.

21      All of the independent claims asserted by K-Tech in the motion for partial

22 summary judgment require either production of a "digital television signal" or

23 manipulation of "channel data" or "attributes of a virtual channel." As discussed

24 above, those claim terms refer to broadcast digital television signals and channel

25 data formatted for broadcast television. Accordingly, Blonder Tongue's cable

26 products do not infringe those claims. (*Id.* at ¶ 9.) Because infringement of a

27 dependent claim requires infringement of the claims they depend on, none of the

28 dependent claims asserted by K-Tech in the motion are infringed, either. (*Id.*)

### E.    K-Tech's Proof Is Defective.

Many of the claims in K-Tech's charts cite to evidence that plainly does not show that the particular limitation is satisfied. For the '903 patent, claims 5 and 8 require a terrestrial ATSC-compliant or an 8-VSB output signal, respectively. (Document 68-3, at 5-6.) The cited product literature shows that the Blonder Tongue products output signals QAM-modulated for cable. Thus, they do not infringe those claims. The MUX-12A-IP product outputs four transport streams to internet addresses, rather than modulated for broadcast transmission (Document 68-10, at 3), making any claim requiring a "digital television [RF] signal" inapplicable under any reading of the term ('903 claims 1, 5, 8, 10; '533 claims 11-12). Moreover, for each and every independent claim allegation against the MUX-12A-IP product (rightmost column of Document 68-3), the chart "assumes" that some duplicated PSIP data must be changed, rather than citing to evidence. The chart for '893 claim 14 cites to the output information of the MUX-2A-QAM to satisfy an input side limitation. (*Id.* at 27.) These and other discrepancies each raise a genuine issue of fact and prevent summary judgment.

## V.    CONCLUSION

Blonder Tongue admits that there is no genuine dispute as to the validity of the patents. The patents-in-suit are invalid. K-Tech has admitted that it does not know how prior art devices could have functioned without using K-Tech's alleged invention, and all inferences must, at this time, be drawn in Blonder Tongue's favor. Regarding infringement, genuine disputes of material facts, as shown by numerous errors in K-Tech's supposed expert claim charts and K-Tech's flawed approach to claim, prevent the entry of summary judgment in K-Tech's favor.

Respectfully submitted,

DATED: August 5, 2013

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

s/John C. McNett
John C. McNett (*pro hac vice*)
William A. McKenna (*pro hac vice*)
Blake R. Hartz (*pro hac vice*)
WOODARD, EMHARDT, MORIARTY,
MCNETT & HENRY LLP
111 Monument Circle, Suite 3700
Indianapolis, Indiana 46204
Telephone: (317) 634-3456
E-Mail: jmcnett@uspatent.com
E-Mail: wmckenna@uspatent.com
E-Mail: bhartz@uspatent.com

Jennifer J. Moon (SBN 186201)
Wilson Elser Moskowitz Edelman &
Dicker LLP
555 Flower Street - Suite 2900
Los Angeles, CA 90071-2407
Tel: (213) 443-5100
E-mail: Jennifer.moon@wilsonelser.com

*Attorneys for Defendants*
*Blonder Tongue Laboratories, Inc. and*
*R.L. Drake Holdings, LLC*

Memorandum in Opposition to K-Tech's Motion for Partial Summary Judgment

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 5, 2013, a copy of the foregoing was served

via email, by the Court's electronic filing system, on the following:

Patrick F. Bright (SBN 68709)
WAGNER, ANDERSON & BRIGHT, PC
3541 Ocean View Boulevard
Glendale, California 91208
E-mail: pbright@patentattorney.us

Frank C. Corso (*pro hac vice*)
CORSO LAW LLC
492 Winthrop Street, Suite 5
Rehoboth, MA 02769
E-mail: fcc@corsolaw.com

Steven R. Parminter (SBN 90115)
Jennifer J. Moon (SBN 186201)
Wilson Elser Moskowitz Edelman & Dicker LLP
555 Flower Street - Suite 2900
Los Angeles, CA 90071-2407
Tel: (213) 443-5100
Fax: (213) 443-5101
E-mail: Steven.Parminter@wilsonelser.com
E-mail: Jennifer.moon@wilsonelser.com

                                        s/John C. McNett
                                        John C. McNett